Argued June 25, reversed and indictment dismissed July 16, 1918.

## STATE v. ANDREWS.*

(173 Pac. 1173.)

Larceny—Larceny by Bailee—Failure to Deliver Note—Statute.

1. Where defendant, husband of part owner of ranch sold, intrusted with note, payable to his wife and other owner, for delivery, after indorsement by payees, to agent who negotiated sale in payment of commission, at direction of his wife, she having indorsed, sold note and accounted to her for proceeds, he did not violate Section 1956, L. O. L., denouncing larceny by bailee.

[As to what constitutes larceny, see notes in 57 Am. Dec. 271; 88 Am. St. Rep. 559.]

From Multnomah: GEORGE N. DAVIS, Judge.

Department 2.

Defendant Crayton S. Andrews was indicted, tried and convicted of the crime of larceny by bailee, and appeals.

---

*Authorities discussing the question of larceny or embezzlement by one spouse of other's property are collated in a note in 29 L. R. A. (N. S.) 830.    REPORTER.

By the indictment, the defendant is charged with having on March 26, 1915, in the county of Multnomah and State of Oregon, then and there being, and then and there being the bailee of a certain promissory note dated on the twenty-sixth day of January, A. D. 1915, signed by H. L. Price and S. Anna Price, and for the sum of seventeen hundred · twenty-seven· and fifty one-hundredths dollars ($1727.50) and made payable to the order of C. L. Look and L. M. Andrews of the value of seventeen hundred and twenty-seven and fifty one-hundredths dollars ($1727.50) and the personal property of the said C. L. Look and L. M. Andrews and as such bailee aforesaid, did then and there feloniously embezzle and unlawfully and wrongfully convert the said promissory note to his, the said Crayton S. Andrews' own use, and did then and there unlawfully and feloniously fail, neglect and refuse to deliver, keep or account for the said property according to the nature of his trust, contrary to the statutes in such cases made and provided, and against the peace and dignity of the State of Oregon.

REVERSED AND INDICTMENT DISMISSED.

For appellant there was a brief and an oral argument by *Mr. Ralph R. Duniway.*

For the State there was a brief over the names of *Mr. Walter H. Evans,* District Attorney, and *Mr. John Collier,* Deputy District Attorney, with an oral argument by *Mr. Collier.*

BEAN, J.—1. The first assignment of error for consideration is the refusal of the court to direct the jury to find a verdict of not guilty, upon motion of defendant's counsel made at the close of the state's case in chief. A similar motion was made in behalf of de-

fendant upon the opening statement of the district at-
torney. This motion was renewed at the close of all
of the testimony. It was claimed by the prosecution
that the defendant had failed to keep or account for
the promissory note described in the indictment ac-
cording to the nature of the trust imposed upon him
when he received the note for delivery to one Sam
Hewey. The facts in the case leading up to and sur-
rounding the bailment of said note with the defendant
and its subsequent alleged conversion by him may be
stated as follows: In June, 1914, the defendant, Cray-
ton S. Andrews, as the owner of a ranch situated in
Wasco County, Oregon, listed the property for sale
with the realty department of Hartman & Thompson,
bankers, in the City of Portland, Oregon. The price
then asked for said ranch was $44,800, the purchaser
to assume the payment of mortgages thereon, amount-
ing to about $19,580. While the defendant represented
to Mr. Sam Hewey, an agent working on a commission
basis for Hartman & Thompson, that he, Andrews, was
the owner of said property; it was in fact owned by
C. L. Look, of The Dalles, Oregon, and his sister,
L. M. Andrews, the wife of the defendant. In Novem-
ber or December of the same year the defendant, An-
drews, orally agreed with Sam Hewey to give him one
half of all above the sum of $20,000 that he could get
for the ranch. In the first few days of January, 1915,
a Mr. H. L. Price, who subsequently purchased the
property, called to see Mr. Hewey about purchasing
a good ranch, and on January 4, 1915, went with Mr.
Hewey to see the ranch in Wasco County. They re-
turned to Portland in the forenoon of January 5th.
That evening Sam Hewey sent to the defendant at Los
Angeles, California, a night letter, stating that he had
a prospective buyer for the ranch and asking defend-

ant to wire if he would confirm his offer as to commission, buyer to assume mortgages. Defendant answered that he would do so, and hoped Hewey would make five thousand ($5,000) dollars out of it. On January 7th, Hewey wired defendant as follows:

"Your telegram received. I sold your ranch including stock, implements, and Clarence lease on Kelly place. Price above twenty-five thousand. Have two hundred fifty dollar deposit. Twenty-five hundred to be paid in twenty days, seventy-two hundred fifty in thirty days. Buyer to assume sixteen thousand one hundred twenty-five mortgages, you to square up with Kelly—wire when can come, meet me at Stelwyn Apts."

Defendant Andrews answered that he would meet Hewey on the next Monday as requested. On January 6th, Hewey as agent signed an option agreement with one H. L. Price to sell the land and personal property thereon for $29,580. Defendant met Hewey on January 11, 1915, and after discussing the details concerning the sale and the commission earned by Hewey, and making figures in regard thereto, defendant signed the following agreement:

"I hereby agree to pay Sam Hewey three thousand ten and 50/100 dollars as extra commission above the regular 2½% on the $29,580—sale of my wheat ranch. Regular commission amounts to $739.50."

The negotiations between Mr. Price and the owners of the property continued until February 24th, when the agreed purchase price was paid and deeds were delivered to Price. A note was first prepared to be executed by Price in favor of Sam Hewey, for the sum of $1,727.50, but in order that the purchaser might not know in regard to this amount of commission being paid, the note was changed so as to make C. L. Look

and L. M. Andrews the payees of the note, with the understanding that the note should be indorsed without recourse to Hewey. The note was executed by Price and wife at The Dalles, and indorsed by C. L. Look and sent to Crayton S. Andrews at Portland to have it indorsed by Mrs. Andrews, and it is claimed the note was to have been delivered to Hewey. Part of the commission, $1,272.50, besides the regular commission of 2½ per cent amounting to $739.50, paid to Hartman & Thompson, was received by Hewey. Thereafter in an action which was pending upon appeal to this court when this cause was tried, Hewey obtained a judgment against C. S. Andrews for $1,727.50, the balance of the amount agreed to be paid as commission: See *Hewey* v. *Andrews,* 82 Or. 448 (159 Pac. 1149, 161 Pac. 108).

The evidence on the part of the state tended to show further that Mrs. L. M. Andrews indorsed the note in question, together with one for $863.75, payable to her and delivered them to her husband, the defendant, who sold the two notes to C. J. Broughton of Dayton, Washington, and accounted to his wife for the same. There was no attempt on the part of the prosecution to show that the defendant violated any instruction of either C. L. Look or L. M. Andrews, the owners of the note, as alleged in the indictment, or that he failed to account to either of them for the note according to the nature of his trust.

The state's theory of the case was that the agreement between the interested parties concerning the note was in substance a contract of bailment by the terms of which the equitable title to the note vested in Sam Hewey.

Plainly stated, the evidence indicated that Crayton S. Andrews employed Sam Hewey to sell 1,280 acres

of land, and agreed to pay him an extra commission if he made the sale; one half of all over $20,000 that might be realized for the land; nothing was to be paid Hewey until the sale was completed. The farm was sold by Hewey for more than the $20,000. It was sold with some personal property, and a subsequent agreement in writing was made whereby Andrews promised to pay Hewey $310.50 in addition to the regular commission of 2½ per cent that was to be paid to Hartman & Thompson by whom Hewey was employed. Before the deal was closed, there was some disagreement as to the distribution of the cash between defendant and his brother-in-law Clarence L. Look, and a written agreement adjusting the matter of the proceeds of the ranch was executed by C. L. Look, E. M. Look and Lillie M. Andrews, wife of defendant, and witnessed by defendant, in which it was stated:

"We pay Hewey one half of the chattel mortgage of $3,455; this note will be $1,727.50, then pay him his balance due in cash $1272.50, making a total of $3,000 for his commission."

It is clear that there was an agreement to pay Hewey $3,000, or a note of $1,727.50, and $1,272.50 cash. This was all the transaction amounted to. The $1,272.50 was paid to Hewey. The defendant failed to pay his creditor Hewey the note or its equivalent. This was not larceny nor a conversion, nor embezzlement, but a mere breach of contract: McClain on Criminal Law, Vol. 1, § 639; Bishop on Criminal Law, Vol. 1, § 582. The title to the note never passed to Hewey so that the same would be the subject of larceny from him. The prosecution recognized this and alleged the ownership of the note to be in C. L. Look and L. M. Andrews. There was a total lack of any evidence to show that the note was intrusted to defend-

ant with directions from C. L. Look or L. M. Andrews to deliver the same to Hewey. At the most, there was only an agreement to so dispose of the note. On the other hand, Mrs. L. M. Andrews, the wife of defendant, testified that after the note had been indorsed by C. L. Look who claimed no interest in the note, she indorsed and gave it to the defendant with instructions to sell the same, with another note, and that he accounted to her for such sale. Mrs. L. M. Andrews being the owner of the note had the right to do with it as she pleased: See 2 Bouvier's Law Dictionary for definition of "owner," p. 565; 6 Words and Phrases, 5134. She, therefore, had the right to authorize her husband to sell the note. It was claimed by defendant that the *irregular* commission was to be divided "fifty fifty" between himself and Hewey.

In order to show a violation of Section 1956, L. O. L., it'was necessary for the state to show that the rights of the legal owner of the note had been invaded to some extent, or that there had been a felonious conversion of the note to the defendant's own use: *State* v. *Skinner,* 29 Or. 599, 600 (46 Pac. 368); *State* v. *Lucas,* 24 Or. 168 (33 Pac. 538).

The state having failed to produce such proof, it was error to refuse to direct the jury to find the defendant not guilty. The judgment of the lower court is therefore reversed, and the indictment dismissed.

REVERSED AND INDICTMENT DISMISSED.

McBRIDE, C. J., HARRIS and JOHNS, JJ., concur.